# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

John Perry Larson,                                    Civ. No. 12-97 (PAM/JJK)

        Plaintiff,

v.

Michael J. Astrue,                          **REPORT AND RECOMMENDATION**
Commissioner of Social
Security,

        Defendant.

---

Charles E. Binder, Esq., and Stephen J. Beseres Esq., Binder & Binder, PC, counsel for Plaintiff.

David W. Fuller, Esq., Assistant United States Attorney, counsel for Defendant.

---

JEFFREY J. KEYES, United States Magistrate Judge

       Pursuant to 42 U.S.C. § 405(g), Plaintiff John Perry Larson seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's application for disability insurance benefits.  This matter is before the Court on the parties' cross-motions for summary judgment.  (Doc. Nos. 8, 10.)  The matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1.  For the reasons stated below, this Court recommends denying Plaintiff's motion and granting Defendant's motion.

**BACKGROUND**

## I.    Procedural History

Plaintiff protectively filed an application for disability insurance benefits on November 10, 2008, alleging a disability onset date of October 1, 2002. (Tr. 125–32.)[1]  His date last insured is March 31, 2009.[2]  (Tr. 22.)  The application was denied initially and on reconsideration.  (Tr. 54–58, 64–66.) Plaintiff timely requested a hearing, which was held before an Administrative Law Judge ("ALJ") on April 27, 2010.  (Tr. 68–69, 24–46.)  At the hearing before the ALJ, Plaintiff amended his onset date to his 50th birthday, December 17, 2004. (Tr. 44.)  On August 18, 2010, the ALJ issued an unfavorable decision.  (Tr. 13–23.)  Plaintiff sought review of the ALJ's decision, but the Appeals Council denied the request for review on November 17, 2011.  (Tr. 1–6.)  The denial of review made the ALJ's decision the final decision of the Commissioner.  *See* 42 U.S.C. § 405(g); *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005); *Browning v. Sullivan*, 958 F.2d 817, 822–23 (8th Cir. 1992).  On January 12, 2012, Plaintiff filed the instant action with this Court seeking judicial review pursuant to 42 U.S.C. § 405(g).  (Doc. No. 1, Compl.)  Pursuant to D. Minn. LR 7.2, the parties have filed cross-motions for summary judgment.

---

[1]    Throughout this Report and Recommendation, the abbreviation "Tr." is used to reference the Administrative Record (Doc. No. 7).

[2]    A claimant has to establish "the existence of a disability on or before the date that the insurance coverage expires."  *Basinger v. Heckler*, 725 F.2d 1166, 1168 (8th Cir. 1984).

## II.    Statement of Facts

Plaintiff has a GED.  (Tr. 182.)  He served in the United States Navy from August 1972 through September 1974.  (Tr. 380.)  He was a mail clerk for the postal service from January 1986 through October 2002 and he stopped working in October 2002 due to impairments in his knees and cervical and lumbar spine, and due to hypertension and arthritis.  (Tr. 177–78.)

Plaintiff completed a Disability Report for the Social Security Administration ("SSA"), which was transcribed on November 10, 2008.  (Tr. 177–87.)  In the report, Plaintiff described his past work with the post office, indicating that he primarily sorted mail and typed in zip codes.  (Tr. 178–79.)  The job required walking thirty minutes per day; standing thirty minutes per day; sitting seven-and-a-half hours per day; no climbing, stooping, kneeling, crouching or crawling; handling or grasping one hour per day; reaching three hours per day; and writing, typing, or handling small objects two hours per day.  (*Id.*)  The job did not require lifting or carrying on a regular basis, and the maximum required lifting was less than ten pounds.  (*Id.*)

Plaintiff also completed a Function Report for the SSA.  (Tr. 201.)  In that report he indicated that he spent his days using a computer and watching television.  (*Id.*)  He also indicated that he could prepare meals daily for thirty minutes to three hours.  (Tr. 202.)  He could clean his house, do laundry, and mow his lawn with a riding mower.  (*Id.*)  His hobby was playing video games on a computer.  (Tr. 203.)  In addition, he emailed and phoned family and friends

daily, and he also visited his son, and his brothers and sisters.  (*Id.*)  Plaintiff

reported that he had used a cane and knee braces for walking since 2002.

(Tr. 204.)

Plaintiff's son completed a Third-Party Function Report for the SSA on

November 23, 2008.  (Tr. 194–99.)  He indicated that he spent time fishing with

Plaintiff in the summer.  (*Id.*)  He believed Plaintiff could walk twelve blocks

before needing to rest for thirty minutes.  (Tr. 196.)  He also corroborated that

Plaintiff's impairments affected his ability to lift, squat, bend, stand, walk, kneel,

and climb stairs.  (*Id.*)  He did not indicate that Plaintiff's ability to reach or use his

hands was affected.  (*Id.*)

Plaintiff completed a subsequent Function Report on January 7, 2009.

(Tr. 222–29.)  The following information was new since the last report.  Plaintiff

watched his grandson from time to time.  (Tr. 223.)  He cared for a pet cat.  (*Id.*)

He took muscle relaxers because pain affected his sleep.  (*Id.*)  He shopped

once a week for about an hour.  (Tr. 225.)  And he did not go out to socialize.

(Tr. 226.)  On a page that was missing from Plaintiff's prior Function Report, he

indicated that arthritis made it difficult for him to do the following things:  lift,

squat, bend, stand, reach, walk, kneel, and climb stairs.  (*Id.*)  He could walk one

block before he needed to rest for thirty minutes.  (*Id.*)  And he continued to

spend most of his days playing games on his computer and watching television.

(Tr. 227.)

The pertinent medical records begin on March 20, 2002, when Plaintiff underwent an orthopedic surgery consultation for right shoulder pain with Dr. Terry Wolff at the VA Medical Center in Fargo ("VAMC Fargo"). (Tr. 388–89.) At that time, Plaintiff had a 60% service connected disability for Reiter's syndrome.[3] (Tr. 388.) During the consultation, Plaintiff complained of pain when reaching. (*Id.*) He had an arthrogram in July 2001 that was suspicious of a partial tear of the supraspinatus. (*Id.*) On examination, flexion and abduction were 160 degrees, and Plaintiff had mild discomfort with palpation of the AC joints. (*Id.*) Plaintiff's ability to grasp was normal, and his biceps and triceps reflexes were normal. (*Id.*) There was mild discomfort of his right shoulder but no redness or induration. (*Id.*) Plaintiff proceeded with an MRI to rule out rotator cuff tear. (Tr. 388–89.) Plaintiff's March 25, 2002 right shoulder MRI suggested diffuse tendonitis with the possibility of some fraying at the undersurface, but without definitive full thickness tear. (Tr. 289–90.) The primary diagnostic code on the MRI report was "major abnormality, no attn. needed." (*Id.*)

Plaintiff followed up with his rheumatologist, Dr. Ann Buettner at VAMC Fargo, on May 2, 2002. (Tr. 387.) Plaintiff complained of diffuse pain in the back, knees, shoulders, and hands. (*Id.*) He also reported that cyclobenzaprine

---

[3]     Reiter's syndrome is a triad of symptoms of unknown origin including urethritis, conjunctivitis, and arthritis, chiefly affecting young men and usually running a self-limited but relapsing course. *Miller-Keane Encyclopedia & Dictionary of Medicine, Nursing and Allied Health* ("*Miller-Keane*") 1263 (7th ed. 2003).

helped him sleep.  (*Id.*)  On examination, Plaintiff had marked crepitation[4] of the knees and shoulders, and no acute inflammation of the hands or knees.  (*Id.*)  Dr. Buettner diagnosed reactive arthritis,[5] osteoarthritis,[6] rotator cuff injury, and low back pain.  (*Id.*)  She noted Plaintiff anticipated having surgery for right rotator cuff tear.  (*Id.*)

X-rays of Plaintiff's knees revealed mild patellar spurs on the right and left, and mild narrowing of the lateral joint compartment on the left.  (Tr. 384.)  The primary diagnostic code on the x-ray report was "minor abnormality."  (*Id.*)  Plaintiff had x-rays of his cervical spine, showing degenerative interspace disease at C6-7 with less prominent changes at C5-6.  (Tr. 288–89.)  The primary diagnostic code on the x-ray report was "minor abnormality."  (Tr. 289.)  Plaintiff also had a negative right foot x-ray.  (Tr. 288.)  His right shoulder x-ray indicated degenerative changes of moderate proportion to the right humerus, and questionable small loose body within the glenohumeral joint, which might also be

---

[4]     Joint crepitus is the grating sensation caused by rubbing together the dry synovial surfaces of joints.  *Dorland's Illustrated Medical Dictionary* ("*Dorland's*") 437 (31st ed. 2007).

[5]     Reactive arthritis is arthritis occurring after an infection.  *Dorland's* at 152.

[6]     Osteoarthritis is a non-inflammatory degenerative joint disease.  Primary osteoarthritis, as part of the normal aging process, is most likely to strike the joints that receive the most use over the years.  Symptoms vary from mild to severe depending on the amount of degeneration that has taken place.  It is caused by disintegration of the cartilage covering the end of bones.  Pain and stiffness result when the surface of the bone is exposed.  *Miller-Keane* at 1526.

sclerosis within the glenoid.  (Tr. 286.)  This x-ray was coded "major abnormality, no attn. needed."  (*Id.*)

Plaintiff underwent a compensation and pension examination with Dr. Gloria Engel at the VAMC Fargo on September 20, 2002.  (Tr. 379–85.) Plaintiff was evaluated for service-connected disability for Reiter's syndrome, which he was diagnosed with in August 1974 while in the United States Navy. (Tr. 380.)   He was now reporting pain in his shoulders, neck, and low back, in addition to his longstanding knee pain.  (*Id.*)  He stated that he tried many medications over the years, and most anti-inflammatories upset his stomach. (*Id.*)  At the time, Plaintiff was working as a letter sorter for the post office, and over the previous three years he used up his sick days and annual leave due to pain.  (*Id.*)  He used massage and knees braces, but pain increased in his shoulders, knees, back, and neck.  (*Id.*)  Plaintiff could stand for thirty minutes before his pain increased, and he reported that he tried to alternate sitting and standing.  (*Id.*)  He fell down three or four times a year when his left knee gave out, and he reported that climbing more than three steps was painful.  (*Id.*)  He avoided ladders and did not do any overhead work or lifting.  (*Id.*)  Plaintiff said he could no longer do yard work, as it took him thirty minutes to cut the lawn, and this caused him increased stiffness and pain for three or four days.  (*Id.*)  To get through work, Plaintiff took four Advil at a time, but this upset his stomach a great deal.  (*Id.*)

On examination, there was minimal evidence of discomfort with left and right knee flexion and extension. (Tr. 380.) There was no evidence of excessive fatiguability, incoordination, or significant loss of range of motion. (Tr. 381.) Plaintiff's left knee was slightly swollen, and Clark's test[7] was positive. (*Id.*) Lachman's and McMurray's tests[8] were negative. (*Id.*) On cervical and lumbar spine range of motion exercises, there was no evidence of excessive pain, fatiguability, incoordination, and only moderate decrease in range of motion. (*Id.*) There was evidence of pain with exercise of the right shoulder with slight fatigability, slight loss of range of motion on the right, and fairly stable on the left. (*Id.*) Dr. Engel diagnosed a history of Reiter syndrome since 1977 with progressive deterioration, degenerative changes and spur formation of multiple joints, and a history [per Plaintiff] of needing total right shoulder replacement. (Tr. 381–82.)

On September 20, 2002, Plaintiff also had x-rays of his lumbar spine. (Tr. 383.) There was developing hypertrophic/osteoarthritic osseous

---

[7]    Clark's Sign is a test designed to identify chondromalacia patella, and a positive test causes a significant amount of pain. Chondromalacia patella is inflammation and pain from poor alignment of the patella over the femur. It is the most common source of chronic knee pain. Eight Tests for Anterior Knee Pain (Institute for Integrative Healthcare Studies Nov. 4, 2005), available at http://www.integrative-healthcare.org/mt/archives/2005/11/eight_tests_for.html.

[8]    Lachman's test stresses the ACL to detect anterior tibial displacement. (*Id.*) McMurray's test is used to predict a tear in the cartilage of the knee joint. David A. Morton, III, M.D., *Social Security Medical Tests* § 1.18 (Vol. 1 2005).

degenerative changes primarily of the facet joints, and L4-5 and L5-S1 degenerative disk disease. (*Id.*) The primary diagnostic code on the x-ray report was "minor abnormality." (*Id.*) Plaintiff also had an x-ray of his left shoulder, showing hypertrophic/osteoarthritic osseous degenerative changes. (Tr. 382.) The primary diagnostic code on this x-ray report was also "minor abnormality." (*Id.*)

Plaintiff saw Dr. Buettner again on November 20, 2002, and told Dr. Buettner that a physician in Minneapolis said he was a candidate for total shoulder replacement. (Tr. 379.) Plaintiff told Dr. Buettner that he stopped work in October due to progression of arthritis in his right shoulder. (*Id.*) Plaintiff reported that over the last year, his benefit from steroid injections was diminishing. (*Id.*) His shoulder pain was less intense since he stopped working, but he was very limited in activity. (*Id.*) His knees were also persistently painful. (*Id.*) Dr. Buettner noted "seeking SS disability, totally appropriate." (*Id.*) On examination, Plaintiff had crepitation in the knees, and his right shoulder abduction was 90 degrees. (*Id.*) Dr. Buettner diagnosed reactive arthritis with secondary osteoarthritis. (*Id.*) She also noted that an x-ray of Plaintiff's right shoulder showed glenohumeral osteoarthritis. (*Id.*)

On January 13, 2003, the VAMC Fargo issued a disability-rating decision regarding Plaintiff, which was based primarily on Plaintiff's May 2, 2002 x-rays and September 20, 2002 physical examination. (Tr. 673–78.) Plaintiff's left knee internal derangement disability was increased from 10 to 30%, but not greater

because his flexion was 116 degrees where 140 was normal, and his extension was normal. (Tr. 673.) Disability from Reiter's syndrome with limitation of motion was rated as follows: the cervical spine was increased from 10 to 20%, but not greater because there were no severe limitations of motion or moderate limitation of motion with demonstrable deformity from fracture. (Tr. 676). Right shoulder disability was increased from 10 to 20%, but not greater because there were no dislocations or marked deformity on x-ray, and limitation of motion was 100 degrees abduction and 108 degrees elevation, and normal is 180 degrees. (Tr. 676–77.) Lumbar spine disability was continued at 20%, because a higher rating required moderate limitation of motion with demonstrable deformity from fracture, which was not present. (Tr. 677.) Right knee disability was continued at 10%, because a higher rating required flexion limited at 30 degrees or extension limited at 15 degrees, which was not present. (Tr. 677.) Left shoulder disability was continued at 10%, but not greater because there was no evidence of dislocation, nonunion or loose movement, and flexion was 140 degrees, abduction was 120 degrees, and 180 was normal. (Tr. 678.) Ultimately, the VA determined that Plaintiff was entitled to unemployability because he was no longer working in November 20, 2002, and Dr. Buettner stated this was totally appropriate. (Tr. 678.)

In March 2003, Nurse Practitioner Gina Kinzler noted Plaintiff might be abusing alcohol after Plaintiff reported drinking a six-pack per day. (Tr. 377.) Plaintiff was encouraged to decrease his alcohol intake and increase his

exercise. (*Id.*) Plaintiff saw Dr. Buettner in follow-up on May 21, 2003. (Tr. 374.) He reported being unable to take ibuprofen due to GI distress. (Tr. 375.) Knee pain prevented him from standing more than twenty minutes, but he could bike two or three miles, unless there was a headwind. (*Id.*) He continued to have back, neck, and shoulder pain, but it was less intense since he retired from the post office. (*Id.*) On examination, Plaintiff had marked crepitus in the neck, shoulders, elbows, and knees, no effusions, and no hand synovitis. (*Id.*) X-rays of his left shoulder showed osteoarthritic degenerative changes, and the primary diagnostic code on the x-ray report was "minor abnormality." (*Id.*)

In follow-up with Dr. Soe Soe Maw at VAMC Fargo on July 28, 2003, Plaintiff said he was feeling fine, and he was taking naproxen and aspirin for joint and low back pain with moderate relief. (Tr. 370.) Dr. Maw treated Plaintiff for hyperlipidemia and hypertension, noting Plaintiff would follow with rheumatology for his arthritis. (Tr. 373–74.) When Plaintiff later saw Dr. Maw on November 6, 2003, he again said he was feeling fine, and specifically denied muscle aches and pain. (Tr. 367.) Then that same day, Plaintiff told Dr. Buettner that he had generalized joint pain, worse in the mornings. (Tr. 633.) The only findings on examination were marked crepitation in the shoulders and knees. (*Id.*) Plaintiff reported his knees swell with overexertion, but it was not observed. (*Id.*)

Plaintiff reported that his knees were more painful in March 2004, which he attributed to high humidity. (Tr. 361.) He also continued to have shoulder pain – his right worse than his left. (*Id.*) He used anti-inflammatories, but only once a

day because they upset his stomach.  (*Id.*)  On examination, Physician Assistant ("PA") Jacquelyn Steckler in Rheumatology at the VAMC noted Plaintiff experienced pain with abduction of his shoulders at 90 degrees, but he could abduct to 150 degrees.  (*Id.*)  Crepitus was observed with rotation of his shoulders, but there was no swelling or temperature change.  (Tr. 361–62.)  There was also significant crepitus of his knees, but no redness, effusion, or warmth of his knee joints.  (Tr. 362.)  Steckler prescribed Synvisc injections.  (*Id.*)

A week after Plaintiff's first Synvisc knee injections, which were on April 15, 2004, his knees were no longer burning, but he felt some discomfort, possibly from doing yard work the previous day.  (Tr. 358–59.)  On examination, there was slight tenderness with palpation to the site of the prior injections but no other tenderness, and no effusion or redness.  (Tr. 358.)  There was no significant tenderness of the left shoulder, which had excellent range of motion.  (Tr. 358–59.)  Plaintiff requested a cane for loss of balance.  (Tr. 616.)  After his second Synvisc injections, he continued to have some knee pain, but he had been active doing yard work again.  (Tr. 357.)  On examination, he walked with a cane and had slight tenderness of the knees with palpation but no redness, swelling, or warmth.  (*Id.*)  On April 28, 2004, Plaintiff had bilateral foot x-rays with no acute findings.  (Tr. 283.)

Plaintiff followed up with Dr. Maw on May 6, 2004, and reported that his knees felt better.  (Tr. 353).  He otherwise denied muscle aches and pain.  (*Id.*)  He was taking Flexeril as needed.  (*Id.*)  Plaintiff also reported his driver's license

was withdrawn for 90 days after getting a DUI in March 2004. (*Id.*) Up to that point, he reported that he had been sober for seventeen years. (*Id.*)

Plaintiff saw PA Steckler for heel pain on July 6, 2004. (Tr. 352.) Plaintiff reported that Ibuprofen helped somewhat, but by the end of the day he had trouble walking. (*Id.*) On examination, he had pain in his right heel with palpation and weight bearing, but no pain or tenderness in the left foot. (*Id.*) His shoulders and elbows were not tender and he had full range of motion. (*Id.*) There was no effusion or pain in his hands and he had equal grip strength bilaterally. (*Id.*) He had no pain in his back or hips. (*Id.*) His knees were tender over the joint lines with bilateral crepitus. (*Id.*)

Plaintiff reported doing fairly well in November 2004. (Tr. 349.) He continued to have generalized joint pain and difficulty sleeping. (*Id.*) With increased activity, he felt stiff and sore. (*Id.*) His only medications were one aspirin during the day, Tylenol PM at bedtime, and omeprazole for GI symptoms. (*Id.*) On examination, Plaintiff's shoulders were nontender bilaterally. (Tr. 350.) His elbows, hands, and wrists had full range of motion and he could make a full fist. (*Id.*) Plaintiff's hips were tender bilaterally, and he had mild crepitation in the knees, with no swelling, redness, or warmth. (*Id.*) He had continued heel pain – his right worse than his left. (*Id.*) PA Steckler diagnosed reactive arthritis, osteoarthritis, history of low back pain and rotator cuff syndrome, and hypertension. (*Id.*) When Plaintiff saw Dr. Maw that month, he reported that he

did not do daily exercise, but he was "pretty active and busy with his garden." (Tr. 345.)

On February 10, 2005, Plaintiff told PA Steckler that he was stiff and sore all over, predominantly his back, neck, and knees.  (Tr. 338.)  Steckler noted that Plaintiff's previous knee x-rays indicated a history of chondromalacia with very mild degenerative changes affecting the joint lines.  (*Id.*)  She also noted his history of degenerative disk disease of the cervical and lumbar spine.  (Tr. 338–39.)  On examination, Plaintiff's shoulders were tender.  (Tr. 339.)  He had mild tender points in his upper back, and tenderness with palpation of the lumbar and cervical spine.  (Tr. 340.)  His knees were not red, warm, or swelling, but pain was noted along the patella and slightly along the medial joint line.  (*Id.*)  There was no swelling in his legs, and no synovitis in his hands or wrists.  (*Id.*)  Steckler prescribed sulfasalazine.[9]  (*Id.*)

After Plaintiff tested positive for rheumatoid factor,[10] he followed up with PA Steckler on March 10, 2005.  (Tr. 335.)  Plaintiff reported that he did not have any improvement in pain or stiffness after starting sulfasalazine.  (*Id.*)  His pain

---

[9]     Sulfasalazine is used to treat rheumatoid arthritis in patients who have not responded well to other medications.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682204.html.

[10]     A rheumatoid factor test measures the presence of a reactive group of proteins called rheumatoid factors in the blood and the synovial fluid. http://www.genixtech.com/medical/GT%20latex%20kits%20inserts%20PDF/RapidTex%20RF%20latex%20insert.pdf.

was mainly in his knees, low back, and right shoulder, with occasional hand stiffness that was not severe. (*Id.*) Chest x-rays showed no signs of rheumatoid disease[11] or pulmonary fibrosis. (Tr. 336.) Lumbar x-rays showed no signs of rheumatoid disease, but disk thinning at L4/5 and L5/S1 with osteophytes and mild sclerosis at L5, and in the sacroiliac joints. (Tr. 337.) On examination, Plaintiff's right shoulder was somewhat tender over the AC joint. (*Id.*) Strength was stable in flexion, extension, abduction, and grip but with some weakness and pain over the supraspinatus area. (*Id.*) There was mild clicking with rotation on the right. (*Id.*) There were no abnormal left shoulder findings. (*Id.*) There was no tenderness in the cervical or thoracic spine with palpation, but Plaintiff felt some tenderness over the lumbosacral region. (*Id.*) His hips were not tender but external rotation caused some mild increase in low back pain. (*Id.*) Plaintiff's knees were slightly tender over the medial joint lines, and there was edema of the lower extremities but not the knees. (*Id.*) There was no significant crepitation

---

[11] Rheumatic diseases are painful conditions caused by inflammation, swelling, and pain in the joints or muscles. Rheumatoid arthritis happens when the immune system becomes hyperactive and attacks the linings of the joints, causing joint pain, swelling, and destruction. An Overview of Rheumatic Diseases (Rheumatoid Arthritis Health Center), available at http://www.webmd.com/rheumatoid-arthritis/an-overview-of-rheumatic-diseases.

with flexion or extension of the knees.  (*Id.*)  PA Steckler prescribed
methotrexate.[12] (*Id.*)

When Plaintiff followed up one month later, he had quit taking
methotrexate due to side effects.  (Tr. 332.)  Plaintiff wanted to go back to
ibuprofen on an as needed basis.  (*Id.*)  When Plaintiff saw Dr. Maw on May 17,
2005, Dr. Maw noted that Plaintiff's rheumatoid arthritis was stable on naproxen.
(Tr. 331.)  Plaintiff also reported that he was active and always busy in his
garden.  (Tr. 551.)

In July 2005, Plaintiff's prevailing symptom was bilateral knee pain, and he
also had some ongoing low back pain and right shoulder pain.  (Tr. 326.)  On
examination, there was some crepitation in his right shoulder with some pain
throughout the joint, but no specific point tenderness.  (Tr. 327.)  Shoulder
abduction was slightly decreased and low back range of motion was slightly
decreased, with some tenderness.  (*Id.*)  There was mild bilateral crepitation in
his knees with no redness, warmth, or significant effusion.  (*Id.*)  There was no
edema in his lower extremities and no tenderness in his ankles or feet.  (*Id.*)  At
that time, Plaintiff did not want to try any new medications.  (*Id.*)

Plaintiff underwent an orthopedic surgery consultation with Dr. Charles
Hartz on September 2, 2005.  (Tr. 325.)  He reported his left knee swelled if he

---

[12]    Methotrexate is used to treat severe active rheumatoid arthritis but may
cause very serious side effects.  http://www.nlm.nih.gov/medlineplus/druginfo/
meds/a682019.html.

walked excessively, and his standing limit was fifteen minutes.  (*Id.*)  He limped

intermittently and had some trouble putting on his socks and shoes.  (*Id.*)  In

addition, his knees made a grinding sound when he climbed stairs or got up from

the couch.  (*Id.*)  On examination, he had full range of motion and good

ligamentous stability.  (*Id.*)  Meniscus testing caused grinding with positive

McMurray's test along the medial joint line.  (*Id.*)  Dr. Hartz gave Plaintiff a

cortisone injection and told him that if his symptoms did not resolve, Plaintiff

would have an arthroscopic examination.  (*Id.*)  X-rays indicated no knee joint

effusions, acute fracture, or dislocation.  (Tr. 280.)  There were mild degenerative

changes of the joints bilaterally but no significant progression noted.  (*Id.*)  The

primary diagnostic code on the x-ray report was "minor abnormality."  (*Id.*)

When Plaintiff followed up with PA Steckler in November 2005, he reported

that he continued to have pain in his left knee and wanted to schedule a scope

for spring 2006.  (Tr. 323.)  Plaintiff denied any flare of his arthritis.  (*Id.*)  The

only abnormal findings on examination were tender left knee and slightly tender

low back.  (Tr. 324.)  Plaintiff also pulled a muscle in his back doing heavy lifting

but felt the pain would resolve without further treatment.  (Tr. 537.)  When

Plaintiff saw Dr. Maw on December 1, 2005, he reported that he was unable to

exercise due to knee pain.  (Tr. 322.)  Dr. Maw noted Plaintiff's rheumatoid

arthritis was stable on naproxen.  (*Id.*)  Then, Plaintiff's arthritis pain was

improved in February 2006, and his only finding on examination was tenderness

of the left knee.  (Tr. 317–18.)

On May 2, 2006, Plaintiff underwent arthroscopy of the left knee with debridement of the femoral groove and torn meniscus. (Tr. 394–95.) Plaintiff was given crutches and exercises to begin the next day. (Tr. 314.) On May 17, Plaintiff had minimal swelling of the left knee and less irritation. (Tr. 313.) And on June 6, 2006, Dr. Maw noted Plaintiff's rheumatoid arthritis was stable. (*Id.*) Plaintiff was taking ibuprofen only once a day. (Tr. 310.)

When Plaintiff saw PA Steckler on August 21, 2006, he denied any rheumatoid arthritis flares. (Tr. 308.) He reported that he stayed inside to avoid difficulty with heat and humidity, which caused increased tenderness and pain. (*Id.*) However, this was soft tissue pain, not joint pain. (*Id.*) His left knee was doing well but swelled if he overdid it. (*Id.*) Physical examination revealed no abnormalities. (Tr. 309.) In November 2006, Plaintiff reported that his pain was better overall. (Tr. 307.) Physical examination revealed only mild pain over the medial joint line of his left knee. (*Id.*) At that time, Plaintiff was taking naproxen only as needed. (*Id.*)

Plaintiff saw Dr. Maw in January 2007, and complained of generalized joint pain after he refrained from taking naproxen for two weeks. (Tr. 303.) Five months later, Plaintiff told PA Steckler that his knee pain was worse and he was having a lot of left shoulder pain that was keeping him awake at night. (Tr. 300–01.) Plaintiff attributed his increased knee pain to weather changes. (Tr. 301.) At that time, his lab tests were within normal limits. (*Id.*) His left knee pain was

generalized, and his left shoulder pain was over the glenohumeral joint and deltoid. (*Id.*) Plaintiff was treated with a left shoulder injection. (*Id.*)

Plaintiff's arthritis was doing better when he saw PA Steckler on September 6, 2007. (Tr. 295.) He used naproxen for pain twice a day. (*Id.*) He reported continued pain in his neck, shoulders, knees, and low back but did not want any other medications due to concern for side effects. (Tr. 296.) He also reported that he had difficulty mowing the lawn and climbing stairs. (Tr. 457.) The only abnormal finding on physical examination at that time was mild pain over the lower lumbar spine. (Tr. 296.)

One year later, on September 4, 2008, Plaintiff complained of continued neck, lower back, and bilateral knee pain, especially after recently falling on his left knee. (Tr. 291.) Plaintiff also continued to have right shoulder pain. (*Id.*) Plaintiff reported trying to remain active by walking. (*Id.*) He could walk up to five blocks before pain in his knees and back caused him to quit. (*Id.*) He reported that he suffered pain for several days with any increase in activity. (*Id.*) He continued to take naproxen twice a day. (*Id.*) Plaintiff requested cyclobenzaprine to help him sleep and reduce pain. (*Id.*) On examination, Plaintiff was tender over the neck with decreased lateral flexion and rotation. (Tr. 292.) He was tender over the right shoulder with decreased abduction. (*Id.*) He had pain over the lower lumbar area, with decreased flexion and extension. (*Id.*) He had pain in the left knee with some swelling, however, there was not enough fluid to aspirate the knee. (*Id.*) PA Steckler noted, "[t]he patient is

disabled and has not been able to work since 2002 secondary to his reactive arthritis." (*Id.*)

On September 19, 2008, PA Steckler wrote the following letter regarding Plaintiff's employability:

> Mr. Larson has been followed in the Rheumatology Clinic at the Fargo Veteran's Administration Medical Center for his reactive arthritis, which developed while serving in the military. The arthritis has affected his knees, shoulders, cervical and lumbar spine. The patient is service connected for his arthritis and has had several knee surgeries secondary to his arthritis. The patient was given a medical retirement from the United States Postal Service due to his arthritis. He was not able to perform the work due to the repetitiveness which required prolonged standing, twisting, stooping, lifting and excessive walking. At this time Mr. Larson's reactive arthritis impairs him from manual labor.

(Tr. 670.)

On November 12, 2008, Dr. Maw completed a Multiple Impairment Questionnaire regarding Plaintiff. (Tr. 683–90.) Dr. Maw's opinion of Plaintiff's physical abilities was based on Plaintiff's knee and low back pain, elicited with joint and spine movement on examinations, and Plaintiff's x-rays. (Tr. 683–84.) Dr. Maw opined that Plaintiff could sit for one hour in an eight-hour workday; stand or walk one hour in an eight-hour workday; and he would need to get up from a sitting position every 30-45 minutes. (Tr. 685.) Plaintiff could occasionally lift 10-50 pounds, and frequently lift five pounds, but could not repetitively lift due to shoulder pain. (Tr. 686.) Plaintiff would have minimal limitations in grasping, turning, and twisting objects, doing fine manipulations, using his left arm for reaching, and moderate limitations in using his right arm for reaching. (Tr. 686–

87.) Dr. Maw opined that Plaintiff could not perform a full-time competitive job on a sustained basis. (Tr. 688.) He opined that Plaintiff's pain would frequently interfere with his attention and concentration, and his impairments would last at least twelve months. (*Id.*) Dr. Maw also indicated that anxiety and depressive moods contributed to the severity of Plaintiff's symptoms; Plaintiff was capable of tolerating low work stress; in an eight-hour workday, he would need unscheduled breaks every thirty minutes, resting for thirty minutes at a time; and Plaintiff would likely miss three or more days of work per month as a result of his impairments. (Tr. 688–89.) In addition, Plaintiff should avoid temperature extremes and humidity, and should not push, pull, kneel, bend, or stoop. (*Id.*)

Dr. Maw also wrote an explanatory letter. (Tr. 682.) He noted that Plaintiff was being treated for reactive arthritis and osteoarthritis, mainly affecting the knees, lower back, and neck. (*Id.*) His explained that Plaintiff's knees and low back were stiff with prolonged sitting and standing, and that he felt pain when walking after sitting and standing for long periods. (*Id.*) He noted that Plaintiff had some relief taking naproxen twice a day, allowing him to "do his daily activities with current regimen." (*Id.*) Dr. Maw indicated that Plaintiff was followed in rheumatology every six to twelve months, and he believed Plaintiff's arthritis was permanent and his underlying joint pain would preclude gainful employment. (*Id.*)

On December 18, 2008, Dr. Mark Nielsen reviewed Plaintiff's social security disability file at the request of the SSA, and completed a Residual

Functional Capacity ("RFC") Assessment form regarding Plaintiff. (Tr. 691–701.) Dr. Nielsen opined that Plaintiff could lift and carry a maximum of ten pounds, stand and/or walk two hours in an eight-hour day, sit for six hours in an eight-hour day, never climb ladders, ropes or scaffolds, and occasionally do the following: climb ramps or stairs, balance, stoop, kneel, crouch, crawl, and overhead reaching. (Tr. 695–97.) Dr. Nielsen also opined that Plaintiff should avoid concentrated exposure to hazards. (Tr. 698.) On January 21, 2009, Dr. Charles Grant reviewed Plaintiff's social security disability file, and affirmed Dr. Nielsen's RFC opinion. (Tr. 707–09.)

On April 7, 2009, Plaintiff saw PA Steckler and complained of pain in his neck, low back, knees, hands, and wrists. (Tr. 731.) Plaintiff reported that he was treating his pain with naproxen and cyclobenzaprine, which he tolerated well. (*Id.*) Plaintiff also stated that prolonged sitting, standing, or riding in a car affected his neck and back, and any chronic repetitive movements affected his back, neck, shoulders, and knees. (*Id.*) On examination, Plaintiff had bilateral knee pain and crepitation. (Tr. 732.) He had pain with percussion over the lower lumbar spine and he had pain with lateral flexion and rotation of the neck. (*Id.*) In addition, his right shoulder was tender. (*Id.*) He had decreased range of motion of the neck and shoulder and he also had some swelling and tenderness over the left knee. (*Id.*) Steckler diagnosed reactive arthritis, osteoarthritis, rotator cuff syndrome, degenerative disk disease of the lumbar spine with facet arthropathy, and degenerative disk disease with neck pain. (*Id.*)

PA Steckler completed a Multiple Impairment Questionnaire regarding Plaintiff that day.  (Tr. 720–27.)  She opined that Plaintiff had the following clinical findings supporting her opinion of Plaintiff's work limitations: knee pain; pain in the shoulders; lower back pain; decreased rotation and lateral flexion of the neck; disk degeneration in the cervical and lumbar spine on x-ray; and [unspecified] findings on knee and shoulder x-rays.  (Tr. 720–21.)  She also stated that Plaintiff's pain was constant, and worse with activity and prolonged postures. (Tr. 722.)  Steckler then gave her opinion of Plaintiff's limitations but noted, "I am not trained in functional capacity assessment.  Recommend OT assessment." (Tr. 722.)  Specifically, Steckler opined that Plaintiff could sit for two hours in an eight-hour day; stand or walk up to one hour in an eight-hour day; needed to get up and move around every hour for fifteen minutes; never lift over fifty pounds; occasionally lift and carry 0 to 50 pounds; never frequently lift or carry;  marked limitation in grasping, turning, and twisting objects, fine manipulations and using arms for reaching, because continuous movements of this type would aggravate neck, back, and shoulder pain; cannot perform full-time competitive job requiring sustained activity; pain would constantly interfere with attention and concentration; emotional factors do not contribute to pain; not malingering; can tolerate moderate work stress; would need unscheduled breaks during eight-hour work day; impairments would cause work absence more than three days per month; should avoid wetness, temperature extremes, humidity, heights; and no pushing, pulling, kneeling, bending, or stooping.  (Tr. 722–26.)

On June 24, 2009, PA Steckler also wrote a letter describing her evaluation and treatment of Plaintiff, and her opinion of Plaintiff's limitations. (Tr. 799.) She indicated that Plaintiff's walking was limited due to arthritis in his knees and back, and his other activities were limited due to his neck, shoulder, hand, and wrist conditions. (*Id.*) She opined that Plaintiff could not perform full-time competitive employment, but his abilities would best be assessed by a functional capacity assessment. (*Id.*)

When Plaintiff saw Dr. Maw on July 8, 2009, his arthritis was again stable on naproxen (Tr. 774), and he was taking omeprazole to control GI symptoms. (Tr. 765.) In November 2009, he discontinued naproxen and started treating his arthritis pain with acetaminophen. (Tr. 767.)

PA Steckler completed another Multiple Impairment Questionnaire regarding Plaintiff on March 12, 2010. (Tr. 791–97.) She opined that Plaintiff had the following limitations from reactive arthritis and osteoarthritis: sit for 2–3 hours in an eight-hour day; stand or walk up to one hour in an eight-hour day; get up and move around every thirty minutes to an hour; occasionally lift and carry up to twenty pounds; do not frequently lift or carry; moderate limitations in grasping, turning, and twisting, and fine manipulations bilaterally; marked limitations in using arms for reaching; could not perform full-time competitive job that required sustained activity; impairments expected to last twelve months; unknown if Plaintiff was a malingerer or whether he could tolerate work stress; estimated he would miss two or more days of work per month due to his

impairments; needs to avoid humidity; and no pushing, pulling, kneeling, bending, or stooping. (Tr. 791–96.)

## III. Testimony

Plaintiff testified to the following at the hearing before the ALJ on April 27, 2010. (Tr. 26–40.) Plaintiff is divorced and lives alone in a house he owns. (Tr. 27.) He was 55-years-old at the time of the hearing, and had a high school equivalent education. (*Id.*) He drove himself to the hearing and had a current driver's license. (Tr. 28.) His disability claim was based on arthritis, with pain in the knees, right shoulder, neck, lower back, and recently, elbow and hand pain. (*Id.*) He took naproxen for pain until it was found to be affecting his iron; then he switched to Tylenol. (Tr. 29.) Plaintiff slept only three or four hours at night due to pain, and he napped in the afternoon. (Tr. 30.)

Plaintiff took care of his house and cut his lawn with a riding mower. (*Id.*) His son cleared heavy snow for him. (*Id.*) Plaintiff did his own cooking, and he did not go to social functions on a regular basis. (Tr. 30–31.) For entertainment, he watched television and went on the Internet. (Tr. 31.) He also went to his son's lake house once a month. (*Id.*) He liked to swim in the lake because it did not put weight on his joints, but he did not otherwise exercise. (Tr. 32.)

Plaintiff last worked at the post office. (Tr. 33.) After having both knees "scoped" at the same time, he was on light duty, sorting letters by hand. (*Id.*) This lasted for fourteen years before his shoulder started to hurt and cortisone shots stopped working. (*Id.*) Plaintiff said a doctor at the Minneapolis VAMC told

him he would need to retire from the post office and have his right shoulder replaced. (*Id.*) Plaintiff received 80% disability and 20% for unemployability from the Veteran's Administration when he retired from the post office. (Tr. 34–35.) Plaintiff's pain then got progressively worse after retirement. (Tr. 43.) At the hearing, Plaintiff decided to amend his onset date to his 50th birthday, December 17, 2004. (Tr. 44.)[13]

Plaintiff did not believe he could perform his past job because of his shoulder pain. (Tr. 35.) He could walk for fifteen minutes before resting, and standing was even harder on his knees. (*Id.*) He could bend at the waist but had some low back pain. (*Id.*) At the time of the hearing, Plaintiff had no problems with his hands. (Tr. 36.) He could lift his twenty-pound grandson. (*Id.*) He could also sit for an hour without a problem. (*Id.*) With the use of braces and a cane, Plaintiff had not fallen for a long time. (Tr. 38.) Climbing stairs was very difficult, and when his neck pain got bad, he had to lie down. (Tr. 38–39.) This happened

---

[13]     The ALJ noted that would be a mistake because "they only go a year prior to the application date . . ." (Tr. 44.) The ALJ further explained, "[t]he evidence does not point back that far is what I tried to explain to you . . ." (*Id.*) The ALJ told Larson to consider the medical expert's and vocational expert's testimony that he could return to his job as he described it. (Tr. 45.) The ALJ then asked Larson if he wanted to think of a date last year when his condition was very bad but before his date last insured and change his onset date. (*Id.*) The ALJ said his suggestion was "a gift." (*Id.*) Larson said he did not want to make that change in his onset date. (*Id.*) Plaintiff believes the ALJ punished him for not taking his advice. (Doc. No. 9, Pl's Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") 32.) This Court reviews the ALJ's decision to determine whether it was based on substantial evidence in the record as a whole, *Heino v. Astrue*, 578 F.3d 873, 878 (8th Cir. 2009), therefore the ALJ's intent is irrelevant.

once every two months.  (*Id.*)  Plaintiff could cook and perform household tasks with breaks.  (*Id.*)

Dr. Andrew Steiner testified as a medical expert at the hearing.  (Tr. 39–41.)  He testified that Plaintiff was treated for osteoarthritis of the lumbar facet joints and Reiter's syndrome, which was now stable.  (Tr. 40.)  He explained that there was little in the record to indicate inflammatory changes at the joints.  (*Id.*)  Plaintiff was treated for pain in both shoulders, with osteoarthritis and possible rotator cuff tear on the right, and some loss of range of motion.  (*Id.*)  Plaintiff had arthroscopy on both knees and reported knee pain.  (*Id.*)  He had osteoarthritic changes in the knee.  (*Id.*)  Plaintiff also reported neck pain.  (*Id.*)  Plaintiff was also obese and had borderline anemia.  (*Id.*)  Dr. Steiner testified that Plaintiff's impairments did not meet or equal a listed impairment, and that Plaintiff could work at a sedentary level with only occasional bending, twisting, and overhead work, with no kneeling, crouching, crawling, climbing, or balancing.  (Tr. 40–41.)

Kenneth Ogren testified at the hearing as a vocational expert.  (Tr. 42, 261.)[14]  Ogren wanted to change Plaintiff's past relevant work in his vocational report to read: "postal mail handler, and that's DOT[15] 209.687-014, it's semi-skilled, light per DOT, sedentary per claimant."  (Tr. 42, 261.)  The ALJ asked

[14]     Ogren's name was spelled phonetically by the hearing transcriber as "Roveran" but the correct spelling appears in the Vocational Report.  (Tr. 261.)

[15]     Dictionary of Occupational Titles, available at http://www.occupationalinfo .org/.

whether Plaintiff's past work required more than occasional bending, kneeling, and overhead work. (Tr. 42.) Ogren stated it did not, based on Plaintiff's description of his past work in Exhibit 1E.[16] (Tr. 43.)

Another vocational expert, Steve Bosch, submitted responses to interrogatories. (Tr. 247–50.) Bosch was asked the following:

> 7. Assume a hypothetical individual who was born on December 17, 1954, has at least a high school education and is able to communicate in English as defined in 20 CFR 404.1564 and 416.964, and has work experience as described in your response to question #6. Assume further that this individual has the residual functional capacity (RFC) to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he is limited in his ability to reach in all directions.

> 8. Could the individual described in item #7 perform any of the claimant's past jobs as actually performed by the claimant or as normally performed in the national economy?

(Tr. 248.) Bosch checked a box for "yes" and responded:

> The Mail Handler position as performed is sedentary per 3368 [Tr. 177–83, Adult Disability Report]. The sorting and typing zip codes would have been and are accomplished with the upper extremities close to the trunk of the body. As noted in #6, the job more closely conforms to the clerical sorter occupation as described in the DOT.

(*Id.*)

## IV. The ALJ's Findings and Decision

On August 18, 2010, the ALJ issued a decision concluding that Plaintiff was not under a disability as defined in the Social Security Act, at any time from

---

[16] Exhibit IE is a Disability Report found in the administrative record at pages 177–83. (*See* Doc. No. 7, Attach. 1, Court Transcript Index at 2.)

the original alleged onset date of October 1, 2002, through the date last insured, March 31, 2009.  (Tr. 22.)  The ALJ followed the five-step procedure for determining if an individual is disabled.  *See* 20 C.F.R. § 404.1520(a).  At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity during the period from his alleged onset date of October 1, 2002, through his date last insured of March 31, 2009.  (Tr. 18.)  At the second step of the evaluation, the ALJ determined that Plaintiff had severe impairments of osteoarthritis of the bilateral knees and right shoulder, degenerative disease of the cervical and lumbar spine, reactive arthritis, and low back, neck, shoulder, and knee pain.  (*Id.*)  At step three of the disability determination procedure, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 19–20.)  In doing so, the ALJ relied on the testimony of the medical expert at the hearing.  (Tr. 20.)

The ALJ determined at step four, that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that he is limited in his ability to reach in all directions.  (Tr. 20.)  The ALJ found that the examination findings in the treatment records did not entirely corroborate Plaintiff's testimony regarding his functional limitations.  (Tr. 21.)  The ALJ cited mild findings on x-ray, no active synovitis, and waxing and waning symptoms relieved with injections and medication.  (*Id.*)  The ALJ also noted that Plaintiff told his rheumatologist that he did well as long as he did not overexert himself.  (*Id.*)  The

29

ALJ also found that Plaintiff's daily activities were not consistent with his subjective complaints. (*Id.*) Plaintiff said he spent most of his time using a computer and watching television. (*Id.*) He had no trouble cooking or cleaning his house, shopping, or mowing his lawn with a riding mower. (*Id.*) Furthermore, Plaintiff had pain relief from Naprosyn, which is not a strong pain medication. (*Id.*) In addition, although Plaintiff's steady work history was a positive factor, his disability pension from the VA created a disincentive to seek work. (*Id.*)

The ALJ also considered the opinion evidence. (*Id.*) He did not give controlling or substantial weight to PA Steckler's opinion of Plaintiff's limitations because they were not supported by examination findings, "which show no abnormalities of the hand, wrist or elbow joints, and only waxing and waning symptoms and reduced range of motion and mild tenderness to palpation of the shoulders, knees, and low back." (*Id.*) Neither did the ALJ give controlling or substantial weight to Dr. Maw's opinion. (*Id.*) The ALJ stated Dr. Maw's opinion was not supported by the clinical findings of Plaintiff's rheumatologist [Dr. Buettner] or by Dr. Maw's treatment notes. (*Id.*) In addition, Dr. Maw was primarily treating Plaintiff for hyperlipidemia and hypertension, not for his musculoskeletal impairments. (*Id.*) Ultimately, the ALJ concluded as follows:

> In sum, the above residual functional capacity assessment is supported by the claimant's account of his daily activities, and by the limited abnormal findings on examinations. The claimant has consistently reported that he engages in a variety of sedentary activities each day, including computer gaming, which requires use of the hands and arms.

(Tr. 22.)

At step four of the disability determination, based on the vocational experts' testimony and response to interrogatories, the ALJ found Plaintiff could perform his past relevant work as a mail handler, as he actually performed the job.  (*Id.*)

## DISCUSSION

### I.    Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated that he or

she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second, that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support conclusion." *Reed v. Sullivan*, 988 F.2d 812, 814 (8th Cir. 1993) (internal quotation marks omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckely v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly

detracts from its weight.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

## II.    Analysis of the ALJ's Decision

Plaintiff challenges the ALJ's RFC finding on various grounds. A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 404.1545(a). In determining a claimant's RFC, the ALJ must consider all relevant evidence and evaluate the claimant's credibility. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence, it is given controlling weight. *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012). "However, [a] treating physician's opinion does not automatically control, since the record must

be evaluated as a whole." *Id.* (quoting *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)). An ALJ can discount or disregard a treating physician's opinion if other medical opinions are supported by better or more thorough medical evidence or if the treating physician renders inconsistent opinions. *Id.* The ALJ must consider every medical opinion in the record and determine how much weight to give the opinion. 20 C.F.R. § 404.1527(c).

### A. Whether the ALJ failed to give appropriate weight to Dr. Maw's opinion

Plaintiff asserts that it was improper for the ALJ to discount Dr. Maw's opinion, and that the only factors relevant to whether a treating physician's opinion is entitled to controlling weight are (1) whether the opinion is supported by clinical and laboratory diagnostic techniques; and (2) whether the opinion is contradicted by other substantial evidence. Plaintiff argues that Dr. Maw's opinion meets these requirements because he based his opinion on clinical findings of knee pain and low back pain elicited with joint and spine movements, and with x-ray findings. Additionally, Plaintiff contends there are many findings in the treatment records similar to those reported by Dr. Maw in the questionnaire containing his RFC assessment. Plaintiff cites evidence of swelling, decreased range of motion, tenderness, and crepitation, the x-rays findings, elevated sedimentation rate, and positive rheumatoid factor. Plaintiff asserts the ALJ should have considered Dr. Maw's opinion in light of all of the treatment records,

not Dr. Maw's records alone, and he points out that the ALJ did not identify any medical opinion in the record that was better supported than Dr. Maw's opinion.

Alternatively, even if Dr. Maw's opinion is not entitled to controlling weight, Plaintiff asserts it is entitled to great weight under the factors in 20 C.F.R. § 1527(c)(2)-(6) for the following reasons: Dr. Maw treated Plaintiff on a regular basis at the VAMC, where Plaintiff was treated for almost eight years; Dr. Maw had access to all of Plaintiff's treatment records at the VAMC; Dr. Maw provided clinical and diagnostic support for his opinions; and Dr. Maw's opinions are consistent with the record as a whole.

The Commissioner contends that Dr. Maw's treatment notes do not corroborate his statement that "joint and spine pain were [clinically] elicited with joint and spine movement." Instead, the Commissioner asserts that Dr. Maw's treatment records show that Plaintiff's musculoskeletal examination findings were normal. The Commissioner further asserts the x-ray reports in the record repeatedly noted only minor abnormalities. In addition, although Plaintiff had an elevated sedimentation rate and positive rheumatoid factor, subsequent x-rays showed no signs of rheumatoid disease. The Commissioner also points out that Dr. Maw did not treat Plaintiff for arthritis, he treated Plaintiff for hyperlipidemia and hypertension. Even so, Dr. Maw repeatedly noted that Plaintiff's arthritis was stable.

This Court concludes that Dr. Maw's opinion is not entitled to controlling or substantial weight because it is contradicted by substantial evidence in the

35

record as whole, despite the fact that Dr. Maw was a treating physician with knowledge of Plaintiff's arthritis treatment at the VAMC. Dr. Maw opined that Plaintiff could only sit for one hour in an eight-hour workday; he would need to stand every 30-45 minutes; he was precluded from pushing, pulling, kneeling, bending, and stooping; and he would need unscheduled breaks every thirty minutes. Dr. Maw explained that Plaintiff's knees and low back became stiff with prolonged sitting or standing. Generally, he opined that Plaintiff's arthritis pain would preclude employment.

The severity of pain is subjective, and an ALJ can discount a claimant's credibility regarding the severity of his pain by considering the physicians' opinions, prior work record, observations of third parties, daily activities, duration, frequency and intensity of pain, precipitating and aggravating factors, side effects and effectiveness of medication, and functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1321–22 (8th Cir. 1984) ("Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms (especially pain) are difficult to prove, disprove, or quantify."). The degenerative arthritis in Plaintiff's knees, and lumbar and cervical spine are minimal, as indicated in the diagnostic codes of his x-ray reports. Plaintiff had arthroscopic surgery for a torn meniscus in his left knee on May 2, 2006, but quickly recovered with minimal subsequent symptoms.

Further, X-rays of Plaintiff's shoulders were diagnostically coded "major abnormality, no attn. needed." Although Plaintiff claimed to need a total shoulder

replacement, there is no evidence of this in the record, and Plaintiff never scheduled this surgery nor did any of his treating sources recommend it.  In addition, there are no records of Plaintiff having physical therapy for his shoulder over the years of medical records.  Although the ALJ cannot discount Plaintiff's credibility solely based on objective findings, the ALJ may consider objective findings as one factor, as the ALJ did here.  *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008).

In addition, Dr. Maw stated that taking naproxen twice a day allowed Plaintiff to sustain his daily activities.  Naproxen, when sold over-the-counter, is used to relieve mild pain from headaches, muscle aches, arthritis, and other mild pain.[17]  At times, Plaintiff used cyclobenzaprine to help him sleep at night, but cyclobenzaprine is a muscle relaxer,[18] and there is little or no evidence that Plaintiff suffered muscle spasms or tension.  Further, Plaintiff spent most of his day using a computer and watching television.  He also babysat his twenty-pound grandson and could lift him.  Plaintiff could work in his garden, mow the lawn with a riding mower, cook, and clean.  None of Plaintiff's treating providers gave him any physical restrictions in his daily life.  *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (affirming ALJ who discounted medical source statement because the functional restrictions in the statement stood alone; they were never

---

[17]     http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html.

[18]     Cyclobenzaprine is also sold under the brand name Flexeril. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html.

mentioned in treatment records and were unsupported by objective testing or reasoning). This Court concludes that the record as a whole, including the objective medical evidence, Plaintiff's use of medication, and daily activities are inconsistent with Dr. Maw's disability opinion. Therefore, the ALJ did not err in granting Dr. Maw's opinion little weight.

**B.     Whether the ALJ failed to give appropriate weight to Physician Assistant Steckler's opinions**

Plaintiff contends that PA Steckler cited clinical and diagnostic findings associated with knee, shoulder, lumbar, and neck pain and impairments in support of her opinions. And Plaintiff further argues that the ALJ should have given Steckler's opinion more weight because she treated Plaintiff regularly over an extended time, she was familiar with his medical history at the VA, she provided detailed clinical and laboratory diagnostic reports to support her opinions, her opinions are consistent with the record as a whole, and she specialized in rheumatology.

The Commissioner first points out that Steckler did not feel qualified to assess Plaintiff's functional capacity and recommended an occupational therapy assessment, and she cited Plaintiff's subjective complaints of pain in support of her disability opinion. In addition, the Commissioner asserts that Plaintiff's x-rays did not support her opinions because they showed minor abnormalities. Further, the Commissioner contends that Steckler's opinions were internally inconsistent, inconsistent with the record, and inconsistent with Steckler's own findings. The

Commissioner cites the following inconsistencies: Steckler opined that Plaintiff could lift up to fifty pounds but was essentially precluded from bilateral grasping, turning, twisting, or using his hands for fine manipulation, while Plaintiff testified he had no trouble using his hands, and the clinical findings supported his testimony. The Commissioner also asserts that Plaintiff's waxing and waning symptoms indicated that there was no continuous twelve-month period when he had disabling symptoms.

Steckler, a physician's assistant, is not an acceptable medical source under the regulations, but her opinion must still be considered and weighed; here, the ALJ gave her opinion little weight. *See* 20 C.F.R. § 404.1527(c) ("[W]e consider all of the following factors in deciding the weight we give to any medical opinion[:]" examining relationship, treatment relationship, length of treatment relationship, nature and extent of treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, specialization, and other factors that tend to contradict or support the opinion). The ALJ found Steckler's opinions were not consistent with the evidence in the record as a whole because Plaintiff had no abnormalities of the hands, wrists, or elbows, and only waxing and waning symptoms associated with his shoulders, knees, and low back. In addition, Steckler limited her opinions by stating she was not trained in functional capacity assessment, and she suggested Plaintiff have an occupational therapy assessment.

Record evidence of Plaintiff's mild to moderate impairments from arthritis does not support Steckler's opinion that Plaintiff has less than sedentary physical abilities. Plaintiff had minimal degenerative changes in his knees, and at its worst, he required arthroscopy of a meniscus tear in the left knee in May 2006, with a short recuperation. There were minimal findings of degenerative arthritis of his lumbar spine, and, over the course of seven years of medical records, Plaintiff rarely complained of back pain or difficulty sitting for prolonged periods.

Plaintiff had only one finding of positive rheumatoid factor and elevated sedimentation rate in seven years, and rarely exhibited any swelling or warmth of a joint to indicate inflammation. Plaintiff's arthritis was frequently characterized as stable, usually with the use of only over-the-counter medication. The symptoms associated with Plaintiff's shoulders, knees, neck, and low back were indeed waxing and waning, and never severe enough to warrant the sitting, reaching, pushing, pulling, and grasping restrictions suggested by Steckler for any twelve-month period. *See Kettering v. Astrue*, No. 4:11CV646 RWS (FRB), 2012 WL 3871995, at *22–23 (E.D. Mo. Aug. 13, 2012) (affirming ALJ's RFC for sedentary work where claimant had improvement in her post traumatic arthritis of the knee, and her subjective complaints were not credible); *Claussen v. Astrue*, Civil No. 10-4258 (JNE/FLN), 2011 WL 6987174, at *11 (D. Minn. Dec. 20, 2011) (stating that the ALJ did not err in giving treating physician's opinion little weight where it was not supported by objective medical evidence, was inconsistent with her own treatment notes, and relied almost exclusively on subjective complaints);

*Hodges v. Astrue*, No. 4:10-CV-00804-NKL, 2011 WL 3320659, at *3 (W.D. Mo. Aug. 2, 2011) (affirming ALJ's denial of disability claim where claimant had rheumatoid arthritis in full to partial remission and early degenerative disc and joint disease of the lumbar spine). Thus, the ALJ provided adequate reasons for giving Steckler's opinions little weight. *See Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005) (stating that inconsistency with other evidence is sufficient reason to discount medical source opinion).

### C. Whether remand is necessary because the ALJ failed to consider the VA disability finding

Plaintiff asserts that the ALJ's failure to reference the VA disability finding or explain why the VA determination was not given any weight was reversible error. The Commissioner argues that disability decisions by any other government agency are nonbinding on the SSA. The Commissioner notes the VA determination was only partial disability, and concludes that in light of the overwhelming evidence detracting from Plaintiff's disability claim, it was proper for the ALJ to give the VA partial disability finding no special significance.

A VA disability determination is indeed nonbinding on the SSA. 20 C.F.R. § 404.1504. However, an ALJ should consider the findings of disability by another government agency. Social Security Ruling 06-3p, 71 FR 45593-03 (SSA Aug. 9, 2006) (stating that the adjudicator should explain the consideration given to other federal agency disability decisions). The VA decision was a partial disability determination, expressly based on Plaintiff's May 20, 2002 x-rays and

41

September 20, 2002 treatment record.  The ALJ did not discuss the VA disability rating decision in his denial.  In fact, the ALJ did not discuss or even mention the evidence underlying the VA determination in his decision, instead, starting his discussion with medical records from April 2004.  While it was error for the ALJ to virtually ignore the VA determination, *see Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998) (stating that findings of disability by other federal agencies must be considered in the ALJ's decision), the error was harmless for the following reasons.

The VA decision does not support Plaintiff's subjective complaints of disabling pain.  Plaintiff was found to have 30% disability of the left knee, 10% disability in his right knee, 20% disability of the cervical spine, 20% disability of the lumbar spine, 20% right shoulder disability, and 10% left shoulder disability. The ratings were not higher because there were no findings of nonunion, fracture or dislocation, and Plaintiff's range of motion of the joints was not limited significantly enough to warrant greater ratings of disability.

Furthermore, Plaintiff's subsequent medical records show little in the way of deterioration after September 2002, and actually show some improvement. For example, Plaintiff could abduct his shoulders to 150 degrees in March 2004; his left shoulder range of motion was excellent in April 2004; he had full range of motion in his shoulders in July 2006; there were no abnormal left shoulder findings in March 2005; there were no signs of rheumatoid disease on the March 2005 lumbar x-ray; he had only slightly decreased shoulder and lumbar

range of motion in July 2005; he had full range of motion in his knees in September 2005; he had no abnormalities of the hands, wrists, elbows, shoulders, hips, knees, or ankles on examination in August 2006; and he had only mild pain over the left knee in November 2006.  Plaintiff had decreased range of motion in the neck, lumbar spine, and right shoulder in September 2008, but the limitation was not quantified by degrees, as in the VA rating decision.  And Plaintiff also had decreased range of motion in the neck and shoulder in April 2009, but again the record does not indicate the degree of limitation.  In sum, none of the VA disability findings or subsequent records was significant enough to warrant greater limitations than assessed by the ALJ – sedentary work with limited reaching in all directions.

### D. Whether the ALJ's RFC finding is supported by medical evidence

The Commissioner contends the medical expert's opinion supports the ALJ's sedentary RFC finding.  In addition, the Commissioner asserts that the light RFC opinions of Drs. Nielsen and Grant also support the ALJ's opinion.  The Commissioner also notes that the ALJ gave Plaintiff the benefit of the doubt and found greater limitations than the state agency reviewing physicians suggested.

Plaintiff asserts the ALJ did not explicitly favor the opinions of Dr. Steiner and the two non-examining state agency reviewing physicians over Dr. Maw's and Ms. Steckler's opinions.  He also asserts that the Commissioner has not

cited any medical opinion that supported the ALJ's RFC finding, and contends that there is no medical opinion that supports the ALJ's finding.

It is true that the ALJ did not state that he relied on Drs. Steiner's, Nielsen's, and Grant's opinions. But implicitly the ALJ agreed with Dr. Steiner's restriction to sedentary work and limited overhead reaching, although the ALJ further limited Plaintiff's reaching in all directions. Thus, the ALJ's opinion is supported by medical evidence. However, the ALJ did not adopt Dr. Steiner's restrictions of no kneeling, crouching, crawling, climbing, or balancing, and occasional bending and twisting, nor did he adopt or even discuss Drs. Nielsen's and Grant's restrictions of no climbing ladders, ropes, or scaffolds, and occasional climbing ramps or stairs, balancing, stooping, kneeling, crouching, crawling, and overhead reaching. An ALJ should address and weigh all medical opinions and explain the weight given to each. 20 C.F.R. § 404.1527(c). The ALJ failed to explain why he gave no weight to the climbing, balancing, stooping, kneeling, crouching, or crawling restrictions. Although this was error, in this case, it was harmless.

The ALJ found that Plaintiff could perform his past work as a mail handler as he performed it. In a Disability Report, Plaintiff indicated his work at the post office required sitting seven-and-a-half hours per day with no climbing, stooping, kneeling, crouching, or crawling; one hour of handling or grasping per day; three hours of reaching; and two hours of writing, typing, or handling small objects. (Tr. 179.) The job did not require lifting on a regular basis, and the maximum

amount lifted was less than ten pounds. The job duties are consistent with the ALJ's RFC finding of sedentary work with limited reaching in all directions. The ALJ's failure to discuss medical opinions of climbing, stooping, kneeling, crouching, and crawling limitations was harmless because these activities were not necessary to the performance of Plaintiff's past relevant work. *See Rittenhouse v. Astrue*, 767 F. Supp. 2d 985, 1002 (N.D. Iowa 2011) (affirming ALJ's decision where claimant's functional capacity evaluation resulted in greater restrictions than ALJ's RFC finding, but the jobs cited by the vocational expert fell within the parameters of the individual's functional capacity evaluation).

### E. Whether the ALJ properly evaluated Plaintiff's credibility

Plaintiff testified that he could walk for fifteen minutes at a time, and standing was more difficult than walking. He could lift twenty pounds and sit for one hour at a time. He used a cane to walk and wore braces on his knees, and he had trouble climbing stairs. Lifting overhead caused shoulder and neck pain, and Plaintiff also testified that he could not perform his past relevant work due to shoulder pain.

Plaintiff contends that the ALJ applied the wrong legal standard in assessing credibility, because the ALJ said Plaintiff's "statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they are inconsistent with the above residual functional capacity." Plaintiff asserts this language implies that the ALJ improperly evaluated the consistency of Plaintiff's subjective complaints against the RFC finding, rather

than with the evidence of record as a whole. The ALJ's decision, however, indicates he considered Plaintiff's subjective complaints in light of the objective medical evidence, Dr. Maw's and PA Steckler's opinions, Plaintiff's course of treatment, Plaintiff's daily activities, and Plaintiff's work history.

Plaintiff also asserts that the ALJ's credibility findings are insufficient because there are extensive abnormal findings in Plaintiff's examinations and x-rays. Plaintiff admits his pain improved with medication but contends there is no evidence it improved enough to sustain a regular job. Plaintiff engaged in some activities, but he asserts his activities were minimal. Finally, Plaintiff contends that the ALJ erred by concluding his receipt of VA disability benefits provided disincentive to work. Plaintiff had substantial earnings for almost twenty-five years prior to the time he became disabled; thus, he asserts his work history should have supported his credibility. The Commissioner contends the ALJ reasonably found that Plaintiff's allegations of disability were not credible based on mild objective findings; his self-described daily activities, and other evidence of Plaintiff doing yard work, biking, walking a mile; no need for strong pain medication; and little motivation to work due to receipt of a substantial VA disability pension.

Here, the ALJ considered appropriate factors based on evidence in the record as a whole in discounting Plaintiff's subjective pain. Plaintiff's arthritis was stable by taking over-the-counter medication. *See Haynes v. Shalala*, 26 F.3d 812, 814 (8th Cir. 1994) (stating that lack of strong pain medication is

inconsistent with subjective complaints of disabling pain). Plaintiff's activities of cooking, cleaning, watching his grandson, gardening and yard work, using a computer, and watching television are inconsistent with Plaintiff's subjective complaints of inability to perform his past relevant work due to shoulder pain. Plaintiff had one minor knee surgery in 2006, but otherwise had limited clinical and diagnostic findings associated with his neck, back, shoulders, and knee impairments. Finally, it was not improper for the ALJ to consider that Plaintiff's receipt of $3,300.00 monthly in disability pension from the VA created a disincentive to work. *See Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004) (affirming when ALJ discounted claimant's credibility in part because incentive to work might be inhibited by receipt of long-term disability income of $1,700.00 per month).

For all of these reasons, including this Court's finding that the ALJ's errors in not discussing each medical opinion and the VA disability determination were harmless, because substantial evidence in the record supports the ALJ's RFC determination, and because the ALJ properly relied on vocational expert testimony in concluding that Plaintiff could perform his past relevant work as he performed it, *see Goff*, 421 F.3d at 794 (stating that a "hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true"), this Court concludes that Plaintiff's motion should be denied and Defendant's motion should be granted.

**RECOMMENDATION**

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 8), be **DENIED**;

2.      Defendant's Motion for Summary Judgment (Doc. No. 10), be

**GRANTED**; and

3.      If this Report and Recommendation is adopted, that judgment be

entered.


Date: January 14, 2013          ___*s/ Jeffrey J. Keyes*_____
                                JEFFREY J. KEYES
                                United States Magistrate Judge


Under Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January 28, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the bases of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.